You may proceed. Good morning, Your Honor. I'm Richard Sagerblum on behalf of the plaintiff appellant, Sherron Hayes. This case is a race discrimination, sex discrimination disparate treatment case. That's the way it was pled and tried or brought to summary judgment down in Clark County. My client works for Clark County. She's an attorney and also a broker, a real estate broker, and she worked in the real estate division where she was involved in property transactions for the county. In 1999, there was a reorganization, or not a reorganization, but there was a request to reclassify this department she worked in, which was the real property management division. And the request was that there were three separate areas to make each of these three separate areas what was called a Schedule 33, which would have been a promotion for her. The way the county worked at that time, they had in personnel office, they had people who they would assign who would go in, look at the job duties, the descriptions, talk to the people, write a report, and evaluate each position based upon what they called the GEMS system. And in that system, which is an objective system, at the end of the day, they would have a score, which they would provide and say, okay, this job is equal to this score, and with that score, this is the schedule that you would be on. So the human resources division picked a woman named Betty Burke, she went into this area, evaluated these three positions, or these three areas, and came up with, in two of the situations, a GEMS score of 669, which equated to a C32, a Schedule 32, which would have been my client was a 30, so that would have been a promotion of two schedules. The other individual who she was being compared to was already a 32. So anyway, Ms. Burke makes this recommendation. Now that she was compared to, it was the two units or divisions or whatever that were being assessed, isn't that the situation in one, and they each got assessments of 32? Right. She wasn't. I'm trying to compare her. In the human resources department, they didn't compare. They just went in and looked at each of the jobs, evaluated it, came up with a score. Right. And in this case, we were trying to say, well, if you have the same score, using these GEMS scores, if they're at equal scores, then you ought to be able to compare that person with respect to how they were treated. The district court said no, because he was a particular job and she was a different kind of job, you can't, those are apples and oranges and you can't compare them. I'm saying is that, you know, if you have an objective system and you had ten people laid out there and they all had the same score, if one of them was given a different treatment, that would be disparate treatment. Okay. And that's our argument. That's one of the reasons the district court threw us out. They said that you couldn't just use the GEMS score to compare yourself to. But wasn't part of the reason that she wasn't given the higher score was that she wasn't going to be the head of a division, but rather a subunit? Well, that was their argument. But if you look at the actual recommendation by this Ms. Burke, that's not what she recommended. You mean the initial recommendation. Right. But then the recommendation was revised. Well, but it wasn't revised. That was the whole point. She makes an initial recommendation that says that really this position is not a separate division,  based on this GEMS score of 669. She goes to a meeting with the assistant county manager, Mr. Allistoy, and in that meeting somehow or other Mr. Allistoy says, no, that's too high, change it. So she goes back, takes off the Schedule 31, I mean Schedule 32, changes it to a Schedule 31, and resubmits it. She doesn't change anything about the job description, anything that the person is doing, doesn't change the title of the job at all, just changes it from a 32 to 31. But isn't that, isn't there undisputed testimony from Ms. Burke, not that for some unknown reason, but for a specific reason after this meeting she changed it to a 31 because she was informed at the meeting that she wasn't going to be, or at least at this time, her department was not going to be a division head and 32 was for division heads. And that's that she testified and it hasn't been rebutted that it was an error she made in misapprehending what the status would be. And it's not the GEMS score, it's a 32 is a division head, a 31 is not. But that's not what the report she signed off on said. The initial report which recommended 32 didn't have her a division head. But my point is didn't she testify at her deposition that that was the reason that she changed it after the meeting from a 32 to a 31, and there has been no showing that that was some pretext for discrimination. Well, but I don't believe that was her testimony. And, in fact, that's not what her initial recommendation said or her subsequent recommendation said. It didn't say she's going to be a division head. It didn't say she's going to be a manager, which was what Mr. Allistoy said. Well, we initially thought she was going to be a manager. I looked at it and changed her to become an administrator. But the initial recommendation said she was going to be an administrator. And that recommendation didn't change. All it changed was the score. So she goes to this meeting with a report that says I recommend she be an administrator, schedule 32, and she comes out of the meeting and it says I recommend she be an administrator, schedule 31. And they say, well, we talked about this, we talked about that. There was too many M plans, there was too much this. But the fact is they never changed her job description. As you look at the report, it even describes how there was uncertainty about how this department was going to evolve. So that's why we were going to leave it at a 32. But what evidence did the plaintiff come forward that this explanation is actually a pretext? That's the $64,000 question, and it's basically a couple of things. First, the fact that they actually have this written report which says one thing, and then you have two witnesses testifying maybe not even directly opposite to the report, but they contradict the report that was signed off on. So if you have a written record at the time which says one thing, and then you have two people later on in deposition testifying differently, I think that creates a question of fact just right there on its face. I mean, how can you argue two years later or four years, actually it's probably more like six years later, that that's not what I meant when that's exactly what was signed off on by these two individuals? I mean, I don't quite understand the argument that she was subject, let's put aside the retaliation claim, to an adverse employment action. As I read the record, she was actually promoted twice. Right. I mean, she was promoted. She just wasn't promoted to where she thought she was going to be promoted. Right. It's just simply this. Again, if you had ten people out there, and you went in and looked at each one and said, okay, we're going to score these people at a certain range, and you scored them, and then one of the people was given a job lower than the range they were scored at, and that person happened to be a black female and everybody else was a white male, why was that person treated differently? Now, you could say it wasn't a promotion. You can say she got a promotion from a 30 to a 31, whatever. But the fact is, if you just take her score, which is a very objective, theoretically an objective basis, her score, she was the only one who was treated differently than her score. And they never changed the report which was used to create the score. If she had made a score, gone to the meeting, the guy says, wait a minute, you have incorrectly done this, changed these job duties, she went back, changed the job duties, changed the score, and came back, we wouldn't be here. But she doesn't do that. Everything she used to arrive at the 669 score, which is what we're talking about, stayed the same. They just changed the number from a 32 to a 31. And the guy who sits next to her who got a 669 score, the white man, he stayed a 32. But he already was a 32. Right. And if that's their argument, well, because he was a 32, we don't want to change him, he really should have been a 31, so be it. But the fact is, because you have this score, which again is theoretically objective, which correlates to a 32, that's how they, I mean, they just, they originally explained that he was a 32 because his score was 669. Her score was 669, and they changed it to a 31. Were they, was it the company policy that if your score was, or the county's policy that if your score was X, you would automatically be promoted? Well, or they'd have to explain why you wouldn't go to where your score level was. You know, which their explanation is, well, the score was really, the job really wasn't what she scored, but the document that they used to justify it correlates to that score. So, I mean, they're kind of in a box here. If they'd said, well, gee, we just think because he's already there, we're going to keep him a 32 because she's new, we're going to bring her a 31, again, that arguably would be a good explanation. But when you have an African-American woman and a white man with the same scores treated differently, I think that creates a question of fact as to why they did that. He wasn't promoted and she was. Well, again, what they're saying is we're going to do a reclassification study on this department, and we're going to say, look at each job, say what they score at, and then we're going to correlate that to their, how we pay them. They didn't correlate her to that score. Now, again, if they'd said, well, we're going to do this, but we're not going to demote somebody else who's already there, but his score, again, when they did his score, it was a 669. He justified the C32. She was the one who they changed, and there's no evidence as to why they did that, other than this conflicting testimony about, well, we didn't want somebody in the M plan, well, she was going to be a manager, and we decided it wasn't going to work. But if you just look at the actual documents, it doesn't, it creates a question. But does the county policy say that if you're a 669, you have to be a 32? I thought that the classification 31 or 32 was a decision that was made in part based on the GEM score, but also in part based on what responsibilities or title there would be, such as administrator versus manager. I don't believe that, but the fact is she was an administrator in the first recommendation where she was recommended for 32, and in the second recommendation where it was changed to 31. Her title did not change. She was administrator in both of them. I said the reports are identical, other than changing the number. It wasn't, they tried to make it confusing and say, well, she was going to be a manager originally, and then we switched it to an administrator, but the original recommendation said administrator. And, again, if that was the county, the county came forward and said our policy is, you know, just because the GEM score is there, we're not going to go along with the GEM score, then, again, we might not be here. But they've never said that. They've always said the GEM score correlates to the grade. And, again, that's why you do it, so you can compare people throughout the bureaucracy. I see my time is up. If it's okay, I'd like to reserve three minutes. You actually can reserve two, almost three minutes, yes, because your time isn't up until it turns red. Oh, okay. Go ahead. I'd like to reserve two and a half minutes. Thank you. Okay, perfect. Good morning, Your Honors. My name is Luther Snavely. I represent Clark County. May it please the Court. Your Honors, Hay's case is extremely implausible and illogical. It's pretty clear from a review of the briefs that she identifies Michael Allistoy, the assistant county manager, as the bad guy here. According to Hay's theory, Allistoy's alleged racial and gender bigotry was not sufficient to stop him from promoting her to a Schedule 31, but it was sufficient to stop him from promoting her to a Schedule 32. Meanwhile, at the same time that he was promoting her to a Schedule 31, he was demoting two white males in Hay's own division, Don Shelley and Mike Zinchak, from Schedule 31 beneath Hay's to a Schedule 30. Allistoy promoted Hay's even though one of Burke's alternate recommendations made to him was that Hay's not be promoted at all. Hay's was the only person who Allistoy promoted in the real property management division, and he testified at page 293 of the record that one of the reasons he promoted her was that she would be the only employee in the division, including Mickey Carter, who would have the opportunity for a raise. He promoted her even though she only had one subordinate employee at the time of the audit. And yet Hay's maintains that Allistoy essentially discriminated against her on account of her race and gender. Hay's position here is implausible, illogical, and unreasonable, and does not raise a genuine issue of material fact. And in fact, this Court has said previously, has held previously, that if the factual context makes the plaintiff's claim implausible, the plaintiff must come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial. And that's California Architectural Building Projects versus Franciscan Ceramics. Before I get to analysis of whether there's a prima facie case made here, which there isn't, I want to correct an assertion made by Hay's in her briefs and possibly made at oral argument today. Allistoy did not tell Burke to change her recommendation. Burke changed it on her own after meeting with Allistoy and Beverly Gloat. At pages 59 and 60 of Burke's deposition, at page 241 of the record, Burke says at first that Allistoy must have told her to change her recommendation. And please keep in mind that at the time of the deposition in 2005, she was trying to remember a meeting that occurred six years previously. At the time of her deposition, was she still employed by the county? No, she was not, Your Honor. She was laid off in 2004, and her position was eliminated. She had no reason whatsoever to help Clark County in this case. Further down on the same page of the deposition, she says that upon further reflection, paraphrasing, she doesn't believe that Allistoy actually told her to change her report. She did it on her own after her discussion with Gloat and Allistoy. And Allistoy confirms this in his own deposition at page 293 of the record. Hayes cannot establish a prima facie case because she is the only person in the Division of Real Property Management who was promoted. In order to establish a prima facie case for failure to promote disparate treatment and discrimination, Hayes must show that a similarly situated employee not in her protected class received a promotion instead of herself. It's impossible to establish a prima facie case for failure to promote if no one else was promoted. Here she was the only one who was promoted in the Division, and therefore she's failed to establish a prima facie case. In her brief, she refers to three other employees, Ken Chambers, Ms. Pappas, and Ms. Burke. Those three employees are not similarly situated to Ms. Hayes. They're in a completely different department, Department of Human Resources. Their promotions were competitive. They were promoted to head three separate fully functional divisions within the Department of Human Resources. And all of them had many subordinates. Hayes only had one. Also, the three people that they replaced were white males. Ken Chambers is African American. Pappas and Burke are females. The director of the Department of Human Resources, Beverly Glode, is an African American female. So prima facie case has not been established here. And really that should be the end of the analysis. But what is the relationship between the GEMS evaluation and whether or not the county automatically puts someone, say, who's evaluated at 669 to a level 32? The county does not automatically place someone in a job based on GEMS score. GEMS score is something that the Department of Human Resources, and actually the human resource analyst, uses to try to compare different jobs to formulate a recommendation. But Ms. Burke testifies that GEMS scores are not submitted to upper management. She testifies to that at 242. The one with the authority to make the decision here was Michael Allistoy. And as Your Honor pointed out earlier, first of all, as I said, typically upper management doesn't look at GEMS scores at all. But the comparison between the two jobs, some sort of formula comparing two jobs, is just one thing that Mr. Allistoy had to consider. So that's my answer to your question. And then on the retaliation claim, so she received these two promotions, and setting aside the timeliness issue for a minute, but after that, she seemed to go downhill. She was reprimanded and suspended. Was there a relationship between her filing the charge? There isn't, Your Honor. Your Honor, there is no evidence in the record of any kind of causal link between the things that she alleges happened to her. There's, I mean, some of these things happened a year and a half after she filed her amended charge. The clauses are, the allegations are time barred. Now, after reading Hayes' brief, I sort of had the inclination that they had abandoned their claim for retaliation. I make several arguments in my opposition brief, and there was no attempt to rebut any of them in Hayes' reply. That her claims were time barred, that there's no causal link because of the temporal, the length of time between the allegations and when she filed her amended charge, that there's no support for these allegations in the record, and that there's no adverse employment action. Moving on to Mr. Allistoy's reasons for doing what he did. Mr. Allistoy explains why he promoted Hayes to a 31 rather than a 32 at length in pages 293 and 294 of the record in his deposition. The Board of County Commissioners had not yet decided whether to make real property management a separate department or to keep it as a division of general services. In the meantime, he decided not to promote anyone to a division management level position or demote anyone from a division management level. Allistoy didn't want to have to come back after the county commission made its decision and either demote someone he had just promoted or re-promote someone that he had just demoted. At the time, real property management was still just division, and ideally the division should have had one division manager level person, not three. And he believed that Hayes' job most resembled that of the airport program administrator in Schedule 31. Pardon me. May I have a? Please go ahead. Thank you. He believed that Hayes' job most resembled that of the airport program administrator, which is a Schedule 31. There's no direct evidence of pretext. In order to show sufficient circumstantial evidence of pretext, the circumstantial evidence has to be specific and substantial in order to create a tribal issue with respect to whether the county intended to discriminate on the basis of race or sex. That they have not done. Also, it's important to note that when analyzing an employer's justifications for pretext, this court has previously held that all that is required is that the employer honestly believe the reasons for its actions, even if the reasons seem foolish, trivial, or baseless to the court. There is nothing in the record to show that Mr. Allistoy is insincere about any of the justifications he gives for his actions. The whole Jim score issue is really irrelevant because Mr. Allistoy was not going to promote Hayes to a 32-division level employee or demote Mickey Carter from a 32 at this time until the Board of County Commissioners had reached a decision on whether to make real property management into a separate department or not. At the time of Mr. Allistoy's decision, he didn't care about the Jim scores. What he cared about was not in trying to anticipate what Clark County Board of Commissioners was going to do and then wind up having them do the other thing and having a bigger mess than the one he already had in trying to make sense of this new division, which had been culled together from other divisions and other pieces and parts of other divisions and departments. He simply disagreed with Ms. Burke. One of the things he says in his deposition is that, Burke's evaluation of the comparison of Hayes' position to the airport program administrator position was simply incorrect because Burke says in a recommendation that Hayes had to do planning and acquisition in the implication that this is broader than the airport position. If that isn't so, in actuality, at the time of the audit, Hayes did not do acquisition. And Mr. Allistoy testifies to this in page 294 of the record. She could not make legal determinations on her own. She could not commit funds on her own. She could not identify projects to be undertaken on her own. That acquisition function was done by a long-range real property planning committee consisting of Mr. Allistoy, Sandy Norskog, and another assistant county manager named Rick Holmes. This committee handled the acquisition function and regularly conferred with the finance department of the Clark County Civil DA's office. There seems to be an implication in Hayes' briefs that we're required to explain, if we didn't promote Hayes from a 31 to a 32, that we're required to explain why we didn't demote Mickey Carter from a 32-31. In other words, that this would morph into some kind of failure-to-demote case rather than a failure-to-promote case. I've never seen any cases that adopt a failure-to-demote theory for Title VII. It would be a radical expansion of Title VII. It's not supported by the statute, and I don't think that the court should indulge Hayes in that argument. Also, yes, Hayes was the only one where the Jim's scores were not followed, but her position was different, because her position was the only one where it was contemplated that they would make a new division manager level position. That isn't true of any of the other positions that were being reclassified in the real property management system. It's true of the property management division, and it looks like I'm out of time. Thank you, Your Honors. Have a good day. Just listening to them, you can see why they went all over the place on trying to explain why they did what they did. Could I interrupt you for just a second and ask you to clarify, have you abandoned the retaliation claim because there was no timely charge filed with respect to any of the alleged acts of retaliation? No. The charge was amended, and it says continuing charge on it. For them to include retaliation, it says continuing charge. The acts that we're asserting all occurred before the EEOC found probable cause on retaliation. They didn't say retaliation is X, they just said we find probable cause for retaliation. So acts to her, the suspension, the things that happened to her during that time period, we're not abandoning. It's very clear we believe in the record, so I didn't want to emphasize that, but the fact is we're not abandoning that claim. And it is clear that after the, she filed the charge, her work history did go downhill. We have affidavits from people who say that she was treated poorly, whatever. So we're not abandoning that claim. But she never filed a charge of retaliation after any of the acts of alleged retaliation? No. That would come under, we believe, under the continuing violations theory, that things that occur while the charge is pending, you don't have to file a separate charge. But just real quickly on this other issue. As you can see, their explanation for why this occurred goes all over the place. We didn't want to, there was uncertainty, so we didn't want to demote one person, we didn't want to raise one person. Then there was, she was a divisive management. The fact is, that wasn't the request. The request was to be an administrator, and the findings specifically said we're not going to get into that, creating separate management areas in this area. The title was administrator, the score was 669, and the first recommendation was for a C32, the second recommendation was a C31. Everybody else who got a GEM score, whether it went up or down, the same thing happened to them. She was the only person who was not correlated to her GEM score. All right. Thank you.  Campaigns versus Clark County will be submitted. We'll take up positions, committee versus the EPA. Thank you.
judges: Thompson, Wardlaw, Bolton